IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN


MARY ANNE NOONAN,                    CLASS ACTION COMPLAINT
An individual,                                   JURY TRIAL DEMANDED
     Plaintiff,
                                                        Case No.
                                                        Hon.
v.


BLUE   CROSS   BLUE   SHIELD   OF
MICHIGAN, a Michigan non-profit
Healthcare corporation,
     Defendant.
_____/

**Mantese Honigman Rossman**
**and Williamson P.C.**
Gerard V. Mantese (P34424)
Gmantese@manteselaw.com
Mark C. Rossman (P63034)
mrossman@manteselaw.com
Attorneys for Plaintiff
1361 E. Big Beaver Road
Troy, MI 48083
(248) 457-9200

**John J. Conway, P.C.**
John J. Conway (P56659)
john@johnjconway.com
Co-Counsel for Plaintiff
26622 Woodward Ave. Ste. 225
Royal Oak, MI 48067
(313) 961-6525
_____/

## CLASS ACTION COMPLAINT

     Plaintiffs, Mary Anne Noonan, on behalf of herself and all others similarly situated, and

for her Complaint against Defendant, Blue Cross Blue Shield of Michigan ("BCBSM"), states as

follows:

## NATURE OF THE CASE

1.      BCBSM enjoys a dominant market position in the commercial health care insurance industry in Michigan.  It is the largest commercial health insurance provider in the State of Michigan with revenues of over $10 billion in 2009 alone.  It insures over 60 percent of Michigan's commercially insured residents, more than nine times its closest competitor.

2.      BCBSM has leveraged its market position in many of its contract negotiations with hospitals to incorporate "most favored nation" ("MFN") clauses in its provider agreements. An MFN clause requires the hospital to charge other commercial insurers for Healthcare Services (as defined in paragraph 12 below) at least as much as it charges BCBSM, or to charge other commercial insurers *more* than it charges BCBSM, usually by some fixed percentage.  In this manner, the MFN is similar to an illegal resale price maintenance agreement.

3.      BCBSM negotiates for inclusion of MFNs in exchange for an increase in the hospital's charges.  Even though BCBSM's costs go up, BCBSM is able to lock in a competitive advantage for that hospital's services *vis-á-vis* its competitors.  Instead of using its market position as Michigan's largest commercial health insurer to negotiate against a hospital's proposed price increases, BCBSM enables these price increases while further cementing its position as the dominant commercial health insurer through MFNs.  This results in rising health care costs for all patients, regardless of whether they are insured by BCBSM, one of its competitors, or are self-insured.

4.      BCBSM's use of MFNs has reduced competition in the price for hospital services contracted for by health insurers in markets throughout Michigan by inhibiting the negotiation of contracts with hospitals setting prices at competitive levels.   The MFNs have harmed competition by (1) reducing the ability of other health insurers to compete with BCBSM, or

actually excluding BCBSM's competitors in certain markets, and (2) artificially raising prices for Healthcare Services paid by Plaintiffs and the Class, including BCBSM's own insureds and self-insured employers with plans administered by BCBSM.

5.     BCBSM's conduct unreasonably restrains trade in violation of Sections 1 and 2 of the Sherman Act, 15 U. S. C. §§ 1 and 2, and Section 2 of the Michigan Antitrust Reform Act, MCL 445.772.

6.     This lawsuit is brought as a class action on behalf of all individuals and entities who purchased healthcare services at a rate contracted for by BCBSM or one of its competitors directly from a hospital with which BCBSM entered into an agreement that included an MFN clause or its equivalent from at least as early as January 1, 2007 to the present (the "Class Period").

7.     Because of BCBSM's unlawful conduct, Plaintiff and the Class (defined below) paid artificially inflated prices for Healthcare Services and, as a result, have suffered antitrust injury to their business or property.

## JURISDICTION AND VENUE

8.     This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 as Plaintiff brings her claims under Section 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees, against BCBSM for the injuries sustained by Plaintiff and the Class by reason of the violations, and hereinafter alleged, of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.  This Court also has pendant and ancillary jurisdiction over the claim under Section 2 of the Michigan Antitrust Reform Act, MCL 445.772, pursuant to 28 U.S.C. § 1337.

9.      This action is also instituted to secure injunctive relief against BCBSM to prevent it from further violations of Sections 1 and 2 of the Sherman Act and Section 2 of the Michigan Antitrust Reform Act as hereinafter alleged.

10.      Venue is found in this district pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26 and 28 U.S.C. § 1391(b), (c), and (d).

11.      Venue and personal jurisdiction are proper in this judicial district because, during the Class Period, BCBSM resided, transacted business, was found, or had agents in this District, and because a substantial part of the events giving rise to Plaintiffs' claims occurred, and a substantial portion of the affected interstate trade and commerce described below has been carried out, in this District.  In addition, BCBSM developed its MFN policy in substantial part in this District, and entered into contracts containing MFNs with hospitals in this district and elsewhere.  BCBSM's conduct has raised and threatens to raise hospital prices in this District and elsewhere.

## DEFINITIONS

12.      As used herein, the term:

a.      "Healthcare Services" refers to services that are ordinarily provided by hospitals, including primary, secondary, and tertiary services.  These include, but are not limited to, obstetrical and pediatric services, psychiatric care, neurosurgery, radiation therapy, cardiology services, orthopedics, trauma centers, diagnostic centers, cancer treatments, internal medicine, and general surgical services.

b.      "Person" means any individual, employee welfare benefit plan, partnership, corporation, association, or other business or legal entity; and

c.      "Class Period" refers to the period from at least January 1, 2007 to the present.

## THE PARTIES

13.      Plaintiff was at all relevant times a resident of Birmingham, Michigan.  During the Class Period, Plaintiff purchased, paid for, or became obligated to pay for Healthcare Services at a rate contracted for by BCBSM or one of its insurer competitors directly from one or more of the hospitals with which BCBSM had an agreement that contained an MFN or its equivalent.  As a result of BCBSM's anticompetitive conduct, Plaintiff paid or is obligated to pay artificially inflated prices for Healthcare Services and was therefore injured by reason of the antitrust violations alleged herein.

14.      BCBSM, also known as "BCBSM Foundation," is a Michigan nonprofit healthcare corporation headquartered in Southfield, Michigan.  Directly and through its subsidiaries, BCBSM provides commercial and other health insurance products, including preferred provider organization ("PPO") health insurance products and health maintenance organization ("HMO") health insurance products.

15.      Various hospitals not named as defendants in this Complaint have entered into agreements with BCBSM and participated in or otherwise performed acts in furtherance of the violations alleged in this Complaint.

## TRADE AND COMMERCE

16.      BCBSM is engaged in interstate commerce and in activities substantially affecting interstate commerce, and the conduct alleged herein substantially affects interstate commerce. Among other things, increased prices for hospital services caused by BCBSM's MFNs are, in some cases, paid by health insurers and self-insured employees across state lines.  BCBSM

5

provides commercial health insurance that covers Michigan residents when they travel across state lines, purchases health care in interstate commerce when Michigan residents require health care out of state, and receives payments form employers outside Michigan on behalf of Michigan residents.

## CLASS ACTION ALLEGATIONS

17.     Plaintiffs bring this action on behalf of themselves individually and as a class action under the provisions of Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all members of the Class defined as:

> All persons or entities in the United States of America and Puerto Rico -- except those who solely paid fixed amount co-pays, uninsureds who did not pay their bill, Medicaid and Traditional Medicare patients, BCBSM, co-conspirators, other providers of healthcare services, and the present and former parents, predecessors, subsidiaries and affiliates of BCBSM -- who purchased or paid for hospital services at a rate contracted for by BCBSM or one of its insurer competitors directly from a hospital with which BCBSM entered into an agreement that included a "most favored nation" clause ("MFN") or its equivalent from at least as early as January 1, 2007 to the present (the "Class Period").

18.     The Class is so numerous and geographically dispersed that joinder of all members is impracticable.  While Plaintiffs do not know the number and identity of all members of the Class, Plaintiffs believe that there are thousands of Class members, the exact number and identities of which can be obtained readily from BCBSM or from hospital books and records.

19.     There are questions of law or fact common to the Class that relate to the existence of the antitrust violations alleged and the type and common pattern of injury sustained as a result thereof, including but not limited to:

> a.     Whether BCBSM's use of MFNs or their equivalent in its contracts with hospitals is anticompetitive and illegally raised rates for hospital services to members of the class;

6

b.      Whether BCBSM's alleged conduct violates Section 1 of the Sherman Act;

c.      Whether BCBSM's alleged conduct violates Section 2 of the Sherman Act;

d.      Whether BCBSM's alleged conduct violates Section 2 of the Michigan Antitrust Reform Act;

e.      Whether BCBSM's alleged conduct caused injury to the business and property of Plaintiff and the other members of the Class; and

f.      The appropriate measure of damages sustained by Plaintiff and the other members of the Class.

20.     The questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

21.     Plaintiff is a member of the Class, her claims are typical of the claims of the members of the Class, and Plaintiff will fairly and adequately protect the interests of the members of the Class.  Plaintiff and the Class are direct purchasers of Healthcare Services, and her interests are coincident with and not antagonistic to those of the other members of the Class. In addition, Plaintiff has retained and is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

22.     The prosecution of separate actions by individual members of the Class would crate a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for BCBSM.

23.     BCBSM has acted, and refuses to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

24.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The Class is readily definable and is one for which BCBSM has contracts containing MFNs or their equivalent.  Prosecution as a class action will eliminate the possibility of repetitious litigation.  Treatment of this case as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.  Class treatment will also permit the adjudication of relatively small claims by many class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this Complaint.  This class action does not present any difficulties of management that would preclude its maintenance as a class action.

## FACTUAL BACKGROUND

25.     BCBSM is by far the larges provider of commercial health insurance in Michigan and has been for many years.  BCBSM competes with for-profit and nonprofit health insurers.  BCBSM's commercial health insurance policies cover more than three million Michigan residents, more than 60% of the commercially insured population.  BCBSM insurers more than nine times as many Michigan residents as its next largest commercial health insurance competitor.  BCBSM had revenues in excess of $10 billion in 2009.  BCBSM has market power in the sale of commercial health insurance in each of the relevant geographic markets alleged below.

26.     BCBSM is also the largest non-governmental purchaser of health care services, including hospital services, in Michigan.  As part of its provision of health insurance, BCBSM

purchases hospital services on behalf of its insured from all 131 general acute care hospitals in the state.  BCBSM purchased more than $4 billion in hospital services in 2007.

27.    Over the past several years, BCBSM has sought to include MFNs (sometimes called "most favored pricing," "most favored discount," or "parity" clauses) in many of its contracts with hospitals.  BCBSM currently has agreements containing MFNs or similar clauses with at least 70 of Michigan's 131 general acute care hospitals.  These 70 hospitals operate more than 40% of Michigan's acute care hospital beds.

28.    BCBSM generally enters into different types of MFNs.  Two of the most egregious require a hospital to provide hospital services to BCBSM's competitors either at higher prices than BCBSM pays or at prices no less than BCBSM pays.  Both types of MFNs inhibit competition:

a.    "MFN-plus."  BCBSM's existing MFNs include agreements with 22 hospitals that require the hospital to charge some or all other commercial insurers more than the hospital charges BCBSM, typically by a specific percentage differential.  These hospitals include major hospitals and hospital systems, and all of the major hospitals in some communities. These 22 hospitals operate approximately 45% of Michigan's tertiary care hospital beds.  (A tertiary care hospital provides a full range of basic and sophisticated diagnostic and treatment services, including many specialized services.)  BCBSM's MFN-plus clauses require that some hospitals charge BCBSM's competitors as much as 40% more than they charge BCBSM.  Two hospital contracts with MFN-plus clauses also prohibit giving BCBSM's competitors better discounts than they currently

receive during the life of the BCBSM contracts. BCBSM's MFN-plus clauses guarantee that BCBSM's competitors cannot obtain hospital services at prices comparable to the prices BCBSM pays, which limits other health insurers' ability to compete with BCBSM. BCBSM has sought and, on most occasions, obtained MFN-plus clauses when hospitals have sought significant rate increases.

b.   "Equal-to MFNs."  BCBSM has entered into agreements containing MFNs with more than 40 small community hospitals, which typically are the only hospitals in their communities, requiring the hospitals to charge other commercial health insurers at least as much as they charge BCBSM. Under these agreements, BCBSM agreed to pay more to community hospitals, which BCBSM refers to as "Peer Group 5" hospitals, raising BCBSM's own costs and its customers' costs, in exchange for the equal-to MFN.  A community hospital that declines to enter into these agreements would be paid approximately 16% less by BCBSM than if it accepts the MFN.  BCBSM has also entered into equal-to MFNs with some larger hospitals.

29.   BCBSM has sought to obtain MFNs in many hospital contracts in exchange for increases in the prices it pays for the hospitals' services.  In these instances, BCBSM has purchased protection from competition by causing hospitals to raise the minimum prices they can charge to BCBSM's competitors, but in doing so has also increased its own costs.  BCBSM has not sought or used MFNs to lower its own cost of obtaining hospital services.

30.     BCBSM's MFNs have caused hospitals to (1) raise prices to BCBSM's competitors by substantial amounts, or (2) demand prices that are too high to allow competitors to compete, effectively excluding them from the market.  By denying BCBSM's competitors access to competitive hospital contracts, the MFNs have deterred or prevented competitive entry and expansion in health insurance markets in Michigan, and increased prices for hospital services paid by Plaintiffs and members of the Class, in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and Section 2 of the Michigan Antitrust Reform Act, MCL 445.772.

31.     In Michigan, as throughout the United States, individuals who are not eligible for Medicare or Medicaid typically obtain health insurance from commercial health insurance companies. Employed individuals most often obtain health insurance through their employers, which typically pay the greater share of insurance premiums.  In 2008, approximately 53% of Michigan residents obtained employer-provided or other group health insurance.  About 7% obtained individual insurance directly from commercial insurance companies, including BCBSM.

32.     Commercial health insurers compete to be chosen by employers and employees based on the quality and breadth of their health care provider networks, the level of benefits provided to employees (including employees' out-of-pocket costs in the form of deductibles, co-payments, and coinsurance), price, customer service, reputation, and other factors.  Employers and some other groups typically select the insurance plan or plans they offer to their employees or group members.  Employees or group members then choose whether to enroll in the group health insurance coverage offered to them and, if multiple health insurance plans are offered, choose among the plans offered.

33.     Employers provide group health insurance on either a "fully-insured" or a "self-insured" (sometimes called "self-funded") basis.  Under fully insured health insurance policies, the insurer bears the risk that health care claims will exceed anticipated losses.  Under self-insured health insurance policies, the employer pays its employees' insured medical costs itself, so a large portion of that risk is borne by the employer (often subject to stop-loss insurance). Self-insurance is a viable option primarily for large employers.  Employers that self-insure usually contract with a health insurance company to obtain access to a health care provider network, including hospitals and physicians, at favorable prices, and for administrative services such as claims processing.  The health insurers that provide this network access and administrative services, known in the industry as "administrative services only" (ASO") arrangements, for self-insured employers with employees in a particular region are generally the same insurers that provide fully insured health insurance in that region.  BCBSM is the largest provider of ASO services in Michigan.  BCBSM processed almost $11 billion in health care claims for self-insured employers in 2009.  Approximately half of BCBSM's commercial health insurance business is self-insurance business.  BCBSM earned more than $750 million in ASO fees in 2009.

34.     Most commercial health insurance plans provide insureds with access to a health care provider network including hospitals and physicians.  Under these plans, insureds receive greater benefits when obtaining health care services from providers that participate in the insurer's provider network.  When an insured receives services from a provider in the insurer's network, the insurer or self-insured employer pays the health care provider at prices and terms negotiated between the insurer and the provider, and the patient often pays a co-pay, a deductible, or a portion of the cost specified in the insurance policy.  Network contracts between

insurers and providers typically prohibit the provider from "balance billing" (charging the patient more than the allowable amount agreed to between the insurer and the provider).  In contract, if there is no network or participation agreement between the insurer and the provider, the insurer typically provides a smaller "out-of-network" insurance benefit, if any, and the insured is often responsible for paying the balance of the provider's full charges.  The costs of medical care are typically 80% or more of the insurers' costs, and the hospital costs are a substantial portion of medical care costs.  Accordingly, insurers' hospital costs are an important element of insurers' ability to offer competitive prices and attract employers.

35.     Hospitals and commercial health insurers generally negotiate a discount to be applied to a substantial hospital fee schedule.  The standardized schedule could be set forth as a master list of hospital fees for services (referred to in the industry as a "chargemaster"), a schedule of fees for treatment of a particular illness (typically based on "diagnosis-related groups" or "DRGs" as defined by Medicare and Medicaid), or on another basis.  BCBSM's equal to MFNs typically require that hospitals not grant other commercial health insurers better discounts from the fee schedules that BCBSM receives.  BCBSM's MFN-pluses typically require that hospitals not grant other commercial health insurers discounts within a specified percentage of BCBSM's discounts.

## **RELEVANT MARKETS**

36.     As alleged below, BCBSM has market power in the sale of commercial health in relevant geographic markets throughout Michigan.  Commercial health insurance excludes government programs such as Medicare and Medicaid, and other products offered by health insurers such as Medicare Advantage that are not available to individuals who do not qualify for Medicare or Medicaid.  Commercial health insurance includes self-insurance arrangements

described above.  BCBSM also has market power in the purchase of hospital services in the relevant health care provider markets described below.

**Relevant Product Markets**

37.     The sale of commercial group health insurance, including access to a provider network, is a relevant product market.  Health insurers compete on the breadth and quality of their provider networks, on premiums, and on the customer's cost of using providers, among other factors.  Group health insurance sold in Michigan usually includes access to a provider network, and most employers and insureds consider an insurer's provider network to be an important element of a health insurance product because the network specifies the physicians and hospitals to which patients can turn for service with substantially lower costs to themselves.

38.     There are not reasonable alternatives to group health insurance, including access to a provider network, for employers or for most employees.  Individual health insurance typically is significantly more expensive than group health insurance, in part because employer contributions to group health insurance premiums are not taxable to the employee and are tax-deductible by the employer.  Virtually all individual health insurance is purchased by persons who do not have access to employer-sponsored group health insurance.

39.     The sale of commercial individual health insurance, including access to a provider network, is also a relevant product market.  Some Michigan residents without access to group health insurance purchase individual health insurance from commercial health insurers.  Individual health insurance is the only product available to individuals without access to group coverage or government programs that allows them to reduce the financial risk of adverse health conditions and to have access to health care at the discounted prices negotiated by commercial health insurers.  There are no reasonable alternatives to individual health insurance for

individuals who lack access to group health insurance or government programs such as Medicare and Medicaid.

40.     Purchasing hospital services directly, rather than through a commercial insurer, is typically prohibitively expensive and is not a viable substitute for group individual commercial health insurance.  Patients without health insurance almost never purchase hospital services directly from hospitals at prices comparable to prices paid by BCBSM.

41.     BCBSM's MFNs apply to hospital services procured for both group and individual commercial health insurance plans, and the anticompetitive effects alleged below have affected and will continue to affect purchasers of both group and individual commercial health insurance.  Group and individual commercial health insurance are referred to herein as "commercial health insurance."

**Relevant Geographic Markets**

42.     Markets for commercial health insurance, including access to a provider network, are local.  As alleged above, one key component of commercial health insurance is access to a provider network, including primary and tertiary care hospitals.  Because patients typically seek medical care close to their homes or workplaces, they strongly prefer health insurance plans that provide access to networks of hospitals and physicians close to their homes and workplaces. Employers offering group health insurance to their employees therefore demand insurance products that provide access to health care provider networks, including primary and tertiary care hospitals, in the areas in which substantial numbers of their employees live and work. Individuals purchasing individual health insurance likewise demand insurance products that provide access to health care provider networks, including hospitals, in the areas in which they live and work.

43.     The relevant geographic market for the purpose of analyzing the effect of an MFN between BCBSM and a hospital on the sale of commercial health insurance is the area in which the seller operates and in which the purchaser can practicably turn for supplies or services.  Since an insurer is selling access to a provider network, among other things, the relevant geographic market for analyzing the effect of an MFN between BCBSM and a hospital on the sale of commercial health insurance is the area in which the hospital subject to the MFN operates and in which employers and insured can practicably turn for hospitals included in the provider network offered for sale as part of a commercial health insurance product.

44.     For example, the relevant geographic market for analyzing the effect of the MFN between BCBSM and Edward W. Sparrow Hospital ("Sparrow"), in Lansing, is the Lansing Metropolitan Statistical Area ("MSA").  Lansing area employers and insureds cannot practicably turn to commercial health insurers that do not offer network access to hospitals in the Lansing MSA.  (MSAs and Metropolitan Statistical Areas are geographic areas defined by the US Office of Management and Budget.)

45.     The following geographic areas are relevant geographic markets for the sale of commercial health insurance:

      a.      The western and central Upper Peninsula (Alger, Baraga, Delta, Dickinson, Gogebic, Houghton, Iron, Keweenaw, Marquette, Ontonagon, and Schoolcraft Counties), where BCBSM has more than 65% of commercially insured lives;

      b.      The Lansing MSA (Ingham, Clinton, and Eaton Counties), where BCBSM has approximately 70% of commercially insured lives;

      c.      The Alpena are (Alpena and Alcona Counties), where BCBSM has more than 80% of commercially insured lives;

d.     The Traverse City Metropolitan Statistical Area (Benzie, Grand Traverse, Kalkaska, and Leelanau Counties), where BCBSM has more than 60% of commercially insured lives;

e.     The "thumb" area (Huron, Sanilac, and Tuscola Counties), where BCBSM has more than 75% of commercially insured lives;

f.     Each of the Detroit, Flint, Kalamazoo, and Saginaw MSA's and the Alma and Midland Metropolitan Statistical Areas, in each of which BCBSM has more than 50% of commercially insured lives;

g.     The Grand Rapids MSA, where BCBSM has more than 45% of commercially insured lives; and

h.     Each of Allegan, Tosco, Montcalm, Osceola, and St. Joseph Counties, in each of which BCBSM has more than 40% of commercially insured lives.

46.     BCBSM has an MFN with at least one significant hospital in each geographic market identified above.  In the western and central Upper Peninsula, and in the Lansing, Detroit, Flint, Grand Rapids, Kalamazoo, and Saginaw MSAs and the Alma and Midland Metropolitan Statistical Areas, BCBSM has MFN-pluses with at least one significant tertiary care hospital.  In the Thumb and in Allegan, Tosco, Montcalm, Osceola, and St. Joseph counties, BCBSM has MFNs with all of the hospitals – all of which are community hospitals – in the market.

47.     The geographic markets identified above approximate the areas served by the hospitals currently subject to BCBSM's MFNs, and approximate the areas in which a commercial health insurer requires a provider network, including primary and tertiary care hospitals, in order to be an effective competitor in that area.  Most employed residents of each of these areas work within the area.  Residents of these areas generally tend to use the tertiary care hospitals, if any, within these areas for tertiary care hospital services.  Therefore, commercial health insurers believe they must include in their networks tertiary care hospitals in these areas in order to compete effectively n the sale of commercial health insurance to employers and residents of these areas.

48.     In addition, commercial health insurers believe they must include community hospitals within these areas in order to be able to compete effectively in the sale of commercial health insurance to employers and residents of these areas.   BCBSM's competitors have paid higher prices at community hospitals in these areas as a result of BCBSM's MFNs, rather than drop the community hospitals from their networks.   In particular, commercial health insurers that offer any HMO product are required by Michigan insurance regulations to include in their HMO networks nearby hospitals for any location in which an HMO product is offered.   Those hospitals include community hospitals that are the only hospitals in certain of the areas identified above.   Several of the health insurers seeking to compete with BCBSM primarily offer HMO products, and approximately 40% of Michigan insureds covered by non-BCBSM commercial health insurance participate in HMOs.

49.     The residents of the markets identified above, and their employers, are victims of BCBSM's MFNs.   Employers and individuals would not reduce purchase of commercial health insurance from commercial health insurers, with provider networks in the geographic markets alleged above, in response to prices above competitive levels by a sufficient amount, to make prices above competitive levels over a sustained period of time unprofitable for a monopoly supplier of commercial health insurance in those markets.   Therefore, the sale of commercial health insurance, including a provider network, in each of the geographic markets alleged above is a properly defined relevant market for the purpose of analyzing the effects of BCBSM's MFNs under the antitrust laws.

## BCBSM'S MARKET POWER

50.     BCBSM has market power in the sale of commercial health insurance in each of the alleged relevant geographic markets.   BCBSM is far and away the largest provider of health insurance in Michigan, with more than 60% of commercially insured lives (including lives covered under self-insurance arrangements administered by BCBSM).   Market shares of the magnitude alleged above create an inference of market power.

51.     The inference of BCBSM's market power arising from its market share is corroborated by BCBSM's demonstrated ability to exercise that market power by, among other things, raising prices, restricting output, erecting barriers to entry, and excluding competitors, as alleged below.

52.     BCBSM's market power in each of the alleged markets is durable because entry into the alleged markets is difficult.  Effective entry into or expansion in commercial health insurance markets requires that a health insurer contract with broad provider networks and obtain hospital prices and discounts at least comparable to the market's leading incumbents. As alleged below, the purpose and effect of BCBSM's MFNs is to prevent competing insurers and potential entrants from obtaining discounts from hospitals that would allow them to compete more effectively with BCBSM.

### BSBSM'S MFNs AND THEIR ANTICOMPETITIVE EFFECTS

**The MFNs and Their Terms**

53.     During the Class Period, BCBSM has sought to include MFNs or similar clauses in many of its agreements with Michigan hospitals.  In some contracts, MCBSM requires the hospital to contract with any other commercial insurer at rates at least as high as the hospital contracts with BCBSM – an equal – to MFN.  In others, BCBSM demands even more and requires the hospital to contract with other insurers at rates higher than those paid by BCBSM, typically by a specified percentage differential – an MFN-plus.  Some BCBSM MFNs contain very limited exceptions, most notably an exception for commercial health insurers with a *de minimis* presence, as discussed below.

54.     BCBSM currently has MFNs in its contracts with more than half of Michigan's general acute care hospitals.  Very few hospitals have refused BCBSM's demands for an MFN.  Other hospitals' contracts have not been renegotiated in recent years, but BCBSM is likely to seek MFNs when its contracts with those hospitals come up for a renegotiation, especially if the hospital requests a price increase.

55.     Most of BCBSM's MFN's require the hospital to "attest" or "certify" annually to BCBSM that the hospital is complying with the MFN, and they often give BCBSM the right to audit compliance.  Hospitals seeking to avoid payment reduction by BCBSM – generally its largest commercial

payer – sometimes contract with BCBSM's competitors at prices even higher than the MFN requires, to avoid any question of compliance and being penalized if BCBSM audits the hospital's compliance with the MFN.

56.     BCBSM's agreements with at least 22 Michigan hospitals contain MFN-plus clauses. These hospitals are among the most important providers of hospital services in their respective areas.  The following hospitals or hospital systems have agreements with BCBSM with MFN-plus clauses:

   a.     Marquette General Hospital, the largest hospital in the Upper Peninsula and the only Upper Peninsula hospital providing tertiary care, where BCBSM's contract requires the hospital to charges BCBSM.

   b.     Sparrow Hospital, the largest hospital in Lansing, where BCBSM's contract requires the hospital to charge BCBSM's significant competitors at least 12.5% more than the hospital charges BCBSM.

   c.     Ascension Health, Michigan's largest hospital system, which owns nine general acute care hospitals subject to an MFN-plus, including the St. John Providence Health System in the Detroit MSA (five hospitals), Borgess Health in the Kalamazoo MSA, Genesys Regional Medical Center in the Flint MSA, St. Mary's Medical Center

   d.     Both hospitals in Saginaw – Covenant, where BCBSM's contract requires the hospital to charge BCBSM, and St. Mary's, identified in subparagraph c above.

   e.     Three Beaumont Hospitals in the Detroit MSA (Royal Oak, Troy, and Grosse Pointe), where BCBSM's MFN requires the hospital to charge BCBSM's competitors at least 25% more than they charge BCBSM.

   f.     Two Mid-Michigan Health Hospitals (Midland and Gratiot), where BCBSM's MFN requires the hospitals to charge BCBSM's competitors at least 14% more than the hospital charges BCBSM.

g.   Metro Health Hospital in Grand Rapids, where BCBSM's MFN requires the differential between BCBSM and other payers to increase over time, to 5% for HMOs and 10% for PPOs.

h.   Alpena Regional Medical Center in Alpena, Botsford Hospital in Farmington Hills, Dickinson Memorial Hospital in Iron Mountain, and Munson Medical Center in Traverse City.

57.    In 2007, BCBSM entered into a "Participating Hospital Agreement" ("PHA") containing MFNs with each of more than 40 hospitals it classifies as "Peer Group 5" hospitals: small, rural community hospitals, which are often the only hospital in their communities.  Under that agreement, BCBSM committed to pay more to those community hospitals that agreed to charge all other commercial insurers rates that would be at least as high as those paid by BCBSM.  Any community hospital that failed to attest compliance with the MFN would be penalized by payments from BCBSM at least 16% less than if it complied with the MFN.

**Anticompetitive Effects of BCBSM's MFNs**

58.    BCBSM's existing MFNs, and the additional MFNs that BCBSM is likely to seek to include in future agreements with Michigan hospitals, have unreasonably lessened competition and will continue to lessen completion by:

a.   Raising the price floor for hospital services to all commercial health insurers;

b.   Maintaining a significant differential between BCBSM's hospital costs and its rivals' costs at important hospitals, which prevents those rivals from lowering their hospital costs and becoming more significant competitive constraints to BCBSM;

c.   Raising hospital costs to BCBSM's competitors, which reduces those competitors' ability to compete against BCBSM;

      d.      Establishing a price floor below which important hospitals would not be willing to sell hospital services to other commercial health insurers and thereby deterring cost competition among commercial health insurers; and

      e.      Limiting the ability of other health insurers to compete with BCBSM by raising barriers to entry and expansion, discouraging entry, and preserving BCBSM's leading market position.

59.      BCBSM often receives substantially better discounts for hospital services than other commercial health insurers receive.  BCBSM knows that its discounts provide a competitive advantage against other health insurers.  BCBSM noted in April 2009 that its "medical cost advantage, delivered primarily through its facility [i.e., hospital] discounts, is its largest source of competitive advantage," and earlier stated that its advantages in hospital discounts "have been a major factor in its success in the marketplace."

60.      In recent years, BCBSM became concerned that competition from other insurers was eroding its hospital discount advantage – as it was.  BCBSM therefore sought to preserve its discount advantage by obtaining MFN-plus clauses, with the "expectation . . . that we would not have any slippage in our differential from what we experience today."  In other words, rather than seeking lower prices from hospitals, BCBSM negotiated MFN-plus clauses to maintain its discount differential and prevent potential competitors from obtaining hospital services at prices close to BCBSM's prices and thereby becoming more significant competitive constraints on BCBSM.  During negotiations in 2009 with one hospital in Grand Rapids, BCBSM wrote that "we need to make sure they [the hospital] get a price increase from Priority if we are going to increase their rates."

61.      In most cases, BCBSM obtained an MFN from a hospital by agreeing to increase its payments to the hospital.  BCBSM has sought and, on most occasions, obtained MFN-plus clauses when hospitals have sought significant rate increases.  BCBSM also agreed to increase rates to Peer Group 5 hospitals as part of the Peer Group 5 PHA, which included an equal to MFN.  Had a hospital not agreed to an MFN, BCBSM would not have agreed to pay the higher rates sought by the hospital.  Thus, the effect

of the MFN has been to raise the prices of hospital services paid by both BCBSM and its competitors, and by self-insured employers.

62.     BCBSM's MFNs have resulted and will continue to result in these anticompetitive effects in each of the relevant markets because they effectively create a large financial penalty for hospitals that do not accept them.  BCBSM patients are a significant portion of these hospitals' business, and BCBSM patients typically are more profitable than Medicare and Medicaid patients, the hospitals' other most significant sources of business.  A hospital that would otherwise contract with a competing insurer at lower prices than it charges.  BCBSM would have to lower its prices to BCBSM pursuant to the MFN if it sought to maintain or offer lower prices in contracts with other commercial insurers.  The resulting financial penalty discourages a hospital with a BCBSM MFN from lowering prices to health insurers competing with BCBSM.  BCBSM's MFNs have caused hospitals to raise prices charged to other commercial health insurers, rather than lower prices to BCBSM.

63.     Prior to agreeing to MFNs with BCBSM, some hospitals gave greater discounts to other commercial health insurers than they gave to BCBSM.  Without BCBSM's MFNs, those hospitals had an incentive to offer lower prices to other insurers seeking to enter or expand in the hospital's service area and increase competition in the sale of commercial health insurance.  However, once BCBSM obtained an MFN with those hospitals, the hospitals were incentivized to no longer offer lower prices to other insurers seeking to enter or expand in the hospital's service area and increase competition in the sale of commercial health insurance.

64.     Some BCBSM MFNs allow for *de minimis* exceptions to the MFN.  For example, BCBSM's MFN with Sparrow Hospital applies to a "significant non-governmental payor . . . whose charges exceed 1.0% of [Sparrow's] total gross patient service charges."  The hospital can charge lower prices to an insurer that does not cross the *de minimis* threshold.  An increase in that insurer's business at the hospital, however, would trigger the MFN and subject the prices the insurer pays Sparrow to the MFN's threshold.  BCBSM's contract with Beaumont Hospitals has similar provisions.  A clause of this

type has the anticompetitive effect of limiting the growth of commercial health insurers with small shares and more favorable discounts than BCBSM.

65.     BCBSM's use of MFNs has caused anticompetitive effects in the markets for commercial health insurance in the geographic markets discussed below, among others.  Hospitals in these markets have raised prices to some commercial health insurers, and declined to contract with other commercial health insurers at competitive prices.  As a result, commercial health insurers that would have entered local markets to compete with BCBSM have not done so, or have competed less effectively than they would have without the MFNs.  BCBSM have not done so, or have competed less effectively than they would have without the MFNs.  BCBSM's MFNs therefore have helped BCBSM maintain its market power in those markets.  The actual anticompetitive effects alleged below illustrate the types of competitive harm that has occurred where BCBSM obtains MFNs from hospitals throughout Michigan.

        **1)     Marquette and the Upper Peninsula**

66.     In 2008, BCBSM entered into a provider agreement with Marquette General Hospital that contained an MFN-plus requiring Marquette General to charge other insurers at least 25% more than it charges BCBSM – a cost differential that would severely limit a competitor's ability to compete with BCBSM.  BCBSM agreed to pay significantly higher prices for hospital services at Marquette General in exchange for and MFN-plus.

67.     BCBSM is by far the largest commercial health insurer in the Marquette area and in the Upper Peninsula, with more than 65% of the commercially insured population of the eleven counties of the western and central Upper Peninsula (identified above).  BCBSM views the Upper Peninsula as a strategically important region, and believes that "no competitor of size exists in the UP as of today."

68.     Marquette General, a 315-bed tertiary care hospital, is the largest hospital and the only tertiary care hospital in Michigan's Upper Peninsula.  Marquette General offers complex surgeries (such as neurosurgery and cardiac surgery), trauma care, and other services that are not available at any other hospital in the Upper Peninsula.  The closest tertiary care hospital to Marquette is in Green Bay,

Wisconsin, 178 miles away; the closest tertiary care hospital in Michigan is in Petoskey, in the northern Lower Peninsula, 203 miles away.

69.     Because a commercial health insurer must provide its subscribers with reasonable access to tertiary hospital care to be able to market a health insurance product, commercial health insurers that seek to market a competitive health insurance plan in the central and western Upper Peninsula must contract with Marquette General at prices that are competitive with BCBSM's prices.  The MFN prevents Marquette General form contracting with other commercial health insurers at prices competitive with BCBSM's hospital prices.

70.     There are several small, community hospitals in the Upper Peninsula.  These hospitals – particularly those in the central and western portions of the Upper Peninsula – generally refer their more complex cases to Marquette General.  Eleven of the thirteen smaller hospitals in the Upper Pennisula – Baraga County Memorial in L'Anse, Bell Memorial in Ishpeming, Grand View Health in Ironwood, Helen Newberry Joy in Newberry, Iron County Community in Iron River, Aspirus Keewenaw in Laurium, Mackinac Straits in St. Ignace, Munising Memorial in Munising, Ontonagon Memorial in Ontonagon, Portage Health in Hancock, and Schoolcraft Memorial in Manistique – are Peer Group 5 PHA.

71.     The only hospitals in the Upper Peninsula that do not currently have MFNs in their contracts with BCBSM are Chippewa County War Memorial Hospital in Sault Ste. Marie, 165 miles from Marquette, and OSF St. Francis Hospital in Escanaba.  Because of its relatively limited scope of services and distance from Marquette, Chippewa War Memorial is not a good alternative to Marquette General for residents of the western or central Upper Peninsula, where 84% of the Upper Peninsula's population resides.  OSF St. Francis also is not a tertiary care hospital and does not offer the range of services offered by Marquette General.  Insurers would not market a health plan with a network including Chippewa War Memorial and/or OSF St. Francis, but lacking Marquette General, to residents of the western or central Upper Peninsula.

72.    Priority Health, a Michigan nonprofit health insurer based in Grand Rapids, sought to enter the market for commercial health insurance in the Upper Peninsula and compete with BCBSM. Without the BCBSM MFN-plus, Marquette General would have give Priority a discount that would have allowed Priority to compete with BCBSM, and Priority would have marketed and provided commercial health insurance in the Upper Peninsula.  However, Marquette General told Priority it would not offer Priority rates less than those required by BCBSM's MFN-plus.  Marquette General accordingly gave Priority an offer with significantly higher rates in order to comply with BCBSM's MFN-plus.

73.    Priority, which had believed it could compete with BCBSM and attract business if it contracted with Marquette General – the Upper Peninsula's principal hospital – at rates comparable to those of BCBSM, concluded that it could not compete with rates at the level required by BCBSM's MFN-plus.  Priority therefore declined to contract with Marquette General at the rates required by the MFN, and did not enter the market for commercial health insurance in the Upper Peninsula.  As a result, BCBSM maintained its leading market share in the commercial health insurance market in the central and western Upper Peninsula.   Other commercial health insurers, including Assurant and Health Alliance Plan ("HAP"), also would have entered into agreements with Marquette General if they had been able to contract with Marquette General at prices comparable to the prices BCBSM pays to Marquette General.

74.    When BCBSM entered into the MFN-plus with Marquette General, BCBSM knew that Marquette General was considering entering into contracts with other commercial health insurers. BCBSM demanded the MFN-plus to prevent competitors from obtaining competitive discounts at Marquette General.  BCBSM believe that its contract with Marquette General would, in BCBSM's own words, "keep blue lock on U.P."

75.    BCBSM increased the prices it pays other hospitals in the Upper Peninsula to induce the hospitals to agree to MFNs.  BCBSM paid Schoolcraft Memorial a price increase in exchange for accelerating by six months the hospital's commitment to charge all other payers at least as much as it charged BCBSM.

76.     BCBSM's MFNs with Peer Group 5 hospitals and with Dickinson County Hospital (a hospital that is also subject to an MFN) prevent these smaller hospitals in the Upper Peninsula from agreeing to lower prices for BCBSM's competitors.  BCBSM's MFNs with Marquette General and other hospitals in the Upper Peninsula have unreasonably lessened competition in the market for commercial health insurance in the central and western Upper Peninsula.

**2)     The Lansing Area**

77.     In June 2009, BCBSM entered into a ten-year provider agreement with Sparrow Hospital, the largest hospital in the Lansing area.  That contract includes an MFN-plus that requires Sparrow to charge other insurers at least 12% more than BCBSM pays.  That contract also provides that BCBSM would raise its rates to Sparrow by $5 million per year more than under BCBSM's standard contract with similar hospitals.  This MFN-plus will result in a price increase in 2011 to the third largest insurer in Lansing.

78.     The two largest – and only tertiary care – hospitals in the Lansing area are Sparrow Hospital and Ingham Regional Medical Center ("IRMC").   Each of these two major hospitals has strengths in different fields.  Lansing area employers and employees generally prefer health insurers that can provide network access to (and discounts at) both hospitals.  Consequently, each of these hospitals is important to health insurers that seek to offer a provider network in the Lansing area.  Without access to both hospitals at competitive rates, insurers cannot offer health insurance plans to Lansing area employers or residents on terms or at premiums that would be competitive with BCBSM products.

79.     BCBSM is by far the largest commercial health insurer in Lansing area, with approximately 70% of insured lives.  The three largest commercial health insurers in the Lansing area, which in the aggregate insure 93% of residents with commercial group health insurance in the Lansing area, are BCBSM, Physicians' Health Plan ("PHP"), which is owned by Sparrow's parent, and McLaren Health Plan, which is owned by McLaren Healthcare Corporation, the owner of IRMC. Each of these three health insurers has competitive discounts at both hospitals.

81.    Sparrow and IRMC agreed in 2006 to contract with each others' health plans at favorable, "mutual and equitable" rates, to obtain comparable rates for each of their own health plans at the competing hospital. Consequently, PHP and McLaren are the only health insurers that obtain hospital services in the Lansing area at the rates comparable to the rates paid by BCBSM. Other insurers do not receive competitive prices.

82.    BCBSM's MFN with Sparrow provides that Sparrow's existing agreements with other insurers are grandfathered until January 1, 2011. After that date, BCBSM's MFN will require Sparrow to raise prices to McLaren. The resulting higher costs will reduce McLaren's effectiveness as a competitor to BCBSM, which will reduce competition and raise prices for commercial health insurance in the Lansing area. The MFN with Sparrow also prevents other potential entrants into the Lansing area, such as Priority Health and Health Plus, from entering the market in a manner that would create effective price competition to BCBSM.

83.    BCBSM also has equal-to MFNs with the three smaller hospitals in the Lansing area: Hayes Green Beach Memorial Hospital in Charlotte, Eaton Rapids Medical Center in Eaton Rapids, and Clinton Memorial Hospital in Saint Johns. The adoption of an MFN caused Eaton Rapids and Hayes Green Beach to increase their prices to BCBSM's competitors by significant amounts. BCBSM's MFNs with these smaller hospitals in the Lansing area have also prevented BCBSM's competitors from obtaining better rates than BCBSM at these hospitals. Rather than providing a means to ensure that BCBSM would pay the lowest prices paid by its competitors, the MFNs had the opposite effect – raising the prices paid by BCBSM's competitors.

84.    BCBSM's MFNs with hospitals in the Lansing MSA have unreasonably restrained trade and lessened competition, and will do so in the future, in the market for commercial health insurance in the Lansing MSA.

**3)** *The Alpena Area*

85.     Alpena Regional Medical Center ("Alpena Regional") is the only tertiary care hospital in Alpena County and in the northeastern Lower Peninsula. The nearest tertiary care hospitals are in Petoskey, 100 miles west, and Bay City, 140 miles south. Alpena Regional is important to health insurers that seek to offer a provider network in the Alpena area. Without access to Alpena Regional at rates competitive with BCBSM's rates, other insurers cannot offer health insurance plans to Alpena area employers or residents at premiums competitive with BCBSM products. Currently, the only two commercial health insurers with significant business in the Alpena area are BCBSM and Priority. BCBSM has a market share of more than 80% in the Alpena area.

86.     In late 2009, BCBSM and Alpena Regional negotiated a new contract. BCBSM offered a substantial rate increase "contingent on the formalization of the most favored discount." In addition, BCBSM sought and obtained a commitment by Alpena Regional that it would not improve the discount given to any other health insurer during the four-year life of the contract – a clause that, according to BCBSM, "prohibits allowing better discounts to be negotiated with payors."

87.     Pursuant to the BCBSM MFN, Alpena Regional reduced Priority's inpatient discount, which increased the prices Priority pays for inpatient services significantly above the prices BCBSM pays. The MFN therefore resulted in a substantial reduction in competition in the sale of commercial health insurance in the Alpena area.

**4)** *The Traverse City Area*

88.     Munson Healthcare owns Munson Medical Center ("Munson") in Traverse City, Paul Oliver Memorial Hospital in Frankfort, and Kalkaska Memorial Medical Center in

Kalkaska, all of which are in the Traverse City Metropolitan Statistical area. Munson is the only tertiary care hospital in the market, and Paul Oliver and Kalkaska are the only other hospitals in the market. The nearest tertiary care hospital other than Munson is in Petoskey, 66 miles north of Traverse City, and is not a reasonable substitute to Munson for Traverse City residents or for insurers seeking to sell commercial health insurance to residents of the Traverse City area. Munson, Paul Oliver and Kalkaska are each vital to health insurers seeking to offer a provider network in the Traverse City area. Without access to these hospitals at competitive rates, insurers cannot offer health insurance plans to Traverse City area employers or residents at premiums competitive with BCBSM products.

89.     BCBSM has entered into an agreement with Munson that requires Munson to charge other health insurers more than it charges BCBSM. BCBSM has entered into the Peer Group 5 PHA with Paul Oliver and Kalkaska, causing them to charge other health insurers at least as much as they charge BCBSM. BCBSM has a market share of more than 60% in the Traverse City area.

90.     Paul Oliver and Kalkaska had previously agreed to grant greater discounts to Priority and Aetna than they had granted to BCBSM. BCBSM's MFNs caused Paul Oliver and Kalkaska to raise their prices significantly to these BCBSM competitors. The price increases substantially reduced the ability of BCBSM's competitors to compete against BCBSM, which reduced competition in the sale of health insurance in the Traverse City area.

**5)**     *The Thumb Area*

91.     There are eight Peer Group 5 hospitals in the three Thumb Counties (Huron, Sanilac, and Tuscola): Caro Community Hospital, Hills and Dales General Hospital, Marlette Regional Hospital, McKenzie Memorial Hospital, Huron Medical Center, Scheurer Hospital,

Deckerville Community Hospital, and Harbor Beach Community Hospital. BCBSM is the largest provider of commercial health insurance, with a market share of more than 75%, in the Thumb area.

92. Each of the hospitals in the Thumb area is important to health insurers seeking to offer a provider network to residents there. Without access to these hospitals at competitive rates, insurers cannot offer health insurance plans to Thumb area employers at premiums that would be competitive with BCBSM products.

93. Through the Peer Group 5 PHA, BCBSM sought and obtained MFNs with Thumb area hospitals with "the realization that some of the[m] are giving commercial carriers discounts that are on par with (or better than) what they [BCBSM]." BCBSM sought and obtained the MFN clause with Thumb area hospitals despite the concern expressed by one hospital that such a clause would "unquestionably…operate to drive up costs to other purchasers." Accordingly, when that hospital accepted the MFN and BCBSM's higher payments, it raised another commercial health insurer's rates.

94. As BCBSM had believed, other commercial health insurers had received discounts from Thumb area hospitals that were in some cases better than the discounts obtained by BCBSM. As a result of the MFN, Thumb area hospitals raised these insurers' rates to levels equal to or greater than BCBSM discount rate. Rather than removing any Thumb area hospital from their networks, the commercial health insurers affected by BCBSM's MFNs in the Thumb area have paid and are paying higher prices to Thumb area hospitals as a result of the hospitals' agreeing to the MFNs. As a result, BCBSM's MFNs with hospitals in the Thumb area have increased costs to competing insurers and to self-insured employers, and reduced insurers' ability

to compete, thereby lessening competition in the market for commercial health insurance in the Thumb area.

**6)**   *Community Hospitals*

95.    As alleged above, BCBSM has offered community hospitals a participating hospital agreement, the Peer Group 5 PHA, under which the hospitals would be subject to an equal-to MFN.  Most community hospitals have accepted this offer and receive higher payments from BCBSM in exchange. These agreements between BCBSM and community hospitals have caused hospitals to raise prices to other insurers by significant amounts – often by 100% or more. For example:

a.    Bronson Lake View Community Hospital, in Paw Paw, in the Kalamazoo MSA, raised price to a competitor to comply with BCBSM's MFN.

b.    At least two hospitals in Montcalm County raised price to BCBSM competitors to comply with BCBSM's MFNs.

c.    Three Rivers Health Medical Center, in Three Rivers, St. Joseph County, raised price to four BCBSM competitors to comply with MFN.

d.    Allegan General Hospital, in Allegan, Allegan County, raised prices to a BCBSM competitor to comply with BCBSM's MFN.

e.    Spectrum Health Reed City Hospital, in Reed City, Osceola County, raised price to three of BCBSM's competitors to comply with the MFN.

96.    In each case, the BCBSM competitor concluded that it needed the community hospital to be able to offer a network that would allow it to compete with BCBSM, and thus agreed to pay, and is paying, higher hospital prices.

97.     As a result, BCBSM's competitors' hospital costs have increased, reducing competition in the sale of health insurance in those areas, and unreasonably restraining trade and lessening competition in the rural areas served by these hospitals.

98.     The anticompetitive effects alleged above illustrate the types of harm that have occurred, and will occur, as a result of BCBSM's MFNs. These effects have occurred and will occur in the markets discussed above, in the Detroit, Fling, Grand Rapids, Kalamazoo, and Saginaw MSAs, and in the Alma and Midland Micropolitan Statistical areas.

99.     There are no precompetitive or efficiency-enhancing effects of the MFNs that would outweigh the anticompetitive effects alleged above.  The MFNs have not led, and will not lead, to lower hospital prices for BCBSM or other insurers.  On no occasion has a BCBSM MFN resulted in BCBSM paying less for hospital services.

100.    If not enjoined, BCBSM's MFNs with Michigan hospitals will have anticompetitive effects in the future. BCBSM has entered into MFNs with hospitals that are essential components of a competitive provider network.  The MFNs preserve a discount differential in favor of BCBSM that is sufficient to prevent effective competition. Absent an injunction, BCBSM will seek to enter into and enforce MFN clauses with other hospitals in Michigan, with the purpose and effect of preventing effective entry or expansion by its competitors.

## VIOLATIONS ALLEGED

### Count One – Unlawful Agreement in Violation of Sherman Act § 1

101.    Plaintiff repeats and realleges the allegations above.

102.    BCBSM has market power in the sale of commercial health insurance in each relevant geographic market alleged herein.

103.    Each of the provider agreements between BCBSM and a Michigan hospital containing an MFN provision is a contract, combination and conspiracy within the meaning of Section 1 of the Sherman Act, 15 U.S.C. § 1.

104.    Each of the challenge agreements has had substantial and unreasonable anticompetitive effects in the relevant markets, including but not limited to:

      a.    Raising the prices of hospital services to commercial health insurers in competition with BCBSM, and to self-insured employers and their employees;

      b.    Unreasonably restricting price and cost competition among commercial health insurers by limiting or preventing commercial health insurers in competition with BCBSM from obtaining competitive pricing from critical hospitals;

      c.    Unreasonably restricting the ability of hospitals to offer to BCBSM's competitors or potential competitors reduced prices for hospital services that the hospitals and insurers consider to be in their mutual interest;

      d.    Unreasonably limiting entry or expansion by competitors or potential competitors to BCBSM in Michigan commercial health insurance markets; and;

      e.    Depriving consumers of hospital services and commercial health insurance or the benefits of free and open competition.

105.    The precompetitive benefits, if any, for these provider agreements do not outweigh the anticompetitive effects of the agreements.

106.    Each of the agreements between BCBSM and a hospital in Michigan containing an MFN clause unreasonably restrains trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Plaintiff and the class are entitled to an injunction and money damages as a result thereof.

### Count Two – Sherman Act § 2 Unlawful Monopolization

107.    Plaintiffs repeats and realleges the allegations above.

108.    BCBSM has monopoly power in the relevant markets. This monopoly power is evidenced in the following two ways:

> a.    BCBSM's unique ability among commercial health insurers to enter into exclusive MFN clauses with hospitals in the relevant markets serves as direct evidence of BCBSM's exercise of actual control over prices and the actual exclusion of competitors.
>
> b.    BCBSM's high market share of the commercial health insurance market in the relevant markets also demonstrates its monopoly power in those markets.

109.    BCBSM has abused and continues to abuse that monopoly power to maintain and enhance its market dominance by unreasonably restraining trade, thus artificially and anti-competitively raising the price of Healthcare Services sold to Plaintiff and the Class.

110.    BCBSM's conduct constitutes unlawful monopolization and unlawful anti-competitive conduct in the relevant markets in violation of Section 2 of the Sherman Act, and such violation and the effects thereof are continuing and will continue unless injunctive relief is granted.

111.    As a direct and proximate result of BCBSM's continuing violations of Section 2 of the Sherman Act, Plaintiff and the other members of the Class have suffered injury and damages in an amount to be proven at trial.

112.    Plaintiff and the Class seek money damages from BCBSM for its violation of Section 2 of the Sherman Act as well as injunctive relief.

113.    BCBSM's unlawful conduct has had the following impacts, among others:

        a.      Prices paid by Plaintiffs and the Class for Healthcare Services were maintained at artificially high and non-competitive levels; and

        b.      Plaintiffs and the other members of the Class have had to pay more for Healthcare Services than they would have paid in a competitive marketplace, unfettered by BCBSM's monopolization of the relevant markets.

114.    During and throughout the Class Period, Plaintiffs and the Class directly purchased Healthcare Services at rates contracted for by BCBSM or its insurer competitors from hospitals with which BCBSM had agreements containing an MFN or its equivalent.

115.    Plaintiffs and the Class paid more for the Healthcare Services that they purchased than they would have paid under conditions of free and open competition.

116.    As a direct and proximate result of BCBSM's conduct, Plaintiffs and the Class have been injured and financially damaged in their respective businesses and property in amounts which are presently undetermined.

### Count Three – Sherman Act § 2 Attempt to Monopolize

117.    Plaintiffs repeat and reallege the allegations above.

118.    BCBSM acted with the specific intent to monopolize the relevant markets.

119.    There was and is a dangerous possibility that BCBSM will succeed in its attempt to monopolize the relevant markets because BCBSM controls a large percentage of those markets, and further success by BCBSM in excluding competitors from those markets will confer a monopoly on BCBSM in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

120.    BCBSM's attempted monopolization of the relevant markets has harmed competition in those markets and has caused injury to Plaintiffs and the Class. Prices of Healthcare Services have been higher than they would have been in a competitive market.

121.    There is no appropriate or legitimate business justification for the actions and conduct which have facilitated BCBSM's attempted monopolization of the relevant markets.

122.    Plaintiffs and the Class have been damaged as the result of BCBSM's attempted monopolization of the relevant markets.

## Count Four – Violation of MCL 445.772

123.    Plaintiffs repeat and reallege the allegations above.

124.    BCBSM entered into agreements with hospitals in Michigan that unreasonably restrain trade and commerce in violation of Section 2 of the Michigan Antitrust Reform Act, MCL 445.772.

125.    BCBSM's relevant conduct was not intended to, nor did it have the effect of, reducing the cost of health care.

126.    BCBSM's relevant conduct was not permitted by the Commissioner of the Office of Financial and Insurance Regulation.

127.    As a direct and proximate result of BCBSM's conduct, Plaintiffs and the Class have been injured and financially damaged in their respective businesses and property, in amounts which are presently undetermined.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiffs request that this Honorable Court:

a.     determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure;

b.     adjudge and decree the BCBSM's conduct violates Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and Section 2 of the Michigan Antitrust Reform Act, MCL 445.772;

c.     enter  judgment for Plaintiffs and the Class against BCBSM for three times the amount of damages sustained by Plaintiffs and the Class as allowed by law, together with the costs of this action, including reasonable attorneys' fees;

d.     permanently enjoin BCBSM, its officers, directors, agents, employees, and successors, and all other persons acting or claiming to act on its behalf, directly or indirectly, from seeking, negotiating for, agreeing to, continuing, maintaining, renewing, using, or enforcing or attempting to enforce any MFNs in any agreement, or any other combination, conspiracy, agreement, understanding, plan, program or other arrangement having the same purpose or effect as an MFN, with any hospital in Michigan;

e.     reform the agreements between BCBSM and hospitals in Michigan to strike the MFN clauses as void and unenforceable; and

f.     award Plaintiffs and the Class any such other and further relief as may be just and proper.

Respectfully submitted,


**MANTESE HONIGMAN ROSSMAN
AND WILLIAMSON, P.C.**
Attorneys for Plaintiff


By:  s/Gerard V. Mantese_____
Gerard V. Mantese (P34424)
Mark C. Rossman (P63034)
1361 E. Big Beaver Rd.
Troy, Michigan 48083
(248) 457-9200

**John J. Conway, P.C.**
John J. Conway (P56659)
john@johnjconway.com
Co-Counsel for Plaintiff
26622 Woodward Ave. Ste. 225
Royal Oak, MI 48067
(313) 961-6525


Dated:  November 4, 2010